STOCKMAN *against* BLAIR and others.

IN ERROR.

1812.

*Pittsburg,*
*Saturday,*
September 19.

THIS was an ejectment in the Common Pleas of *Beaver* county, for 200 acres of land on the waters of *Big Beaver.*

The plaintiff claimed under an improvement and settlement, commenced by one *Jordan;* but it did not appear that any survey had ever been made for *Jordan*, or any one claiming under him. It was in evidence however that a line of the depreciation survey, had been considered as a boundary between one of the persons under whom the plaintiff claimed, and one of the defendants.

The defendants made title as follows: one hundred and twenty-six warrants or orders of survey, for the *Pennsylvania Population Company*, were delivered to *John Hoge* the deputy surveyor of the eleventh district, on the 10th of *June* 1793. Immediately after the receipt of them, *Hoge* delivered all the warrants to *Jonathan Leet*, deputy surveyor of the ninth and tenth districts, in order that it might be ascertained what number of these warrants could be located in his district, the leading warrant in the name of *Matthew M'Connell*, being special, and descriptive of a spot in *Leet's* district adjoining *Hoge's*. *Leet* entered the leading warrant and twelve or thirteen others in his book, and re-delivered the whole to *Hoge*, by whose assistant *Redick*, *all* of them were entered in his book. The warrants entered by *Leet*, were by him located in his district, of which number was a warrant in the name of *Joseph Magoffin*, under which the defendants claimed; and the survey of this tract, *which was made after the return of the warrants* to *Hoge*, was returned by *Leet* to the surveyor-general's office, accepted by him, and a patent issued.

The defendants objected to the plaintiff's recovery, because he had no survey, for which they relied on *Bond's Lessee* v. *Fitz-Randolph* (*a*), *Dawson's Lessee* v. *Laughlin* (*b*), and *Cosby* v. *Brown's Lessee* (*c*).

An actual settler cannot maintain an ejectment for his improvement, without an official survey, or a private one, if by due exertion he was unable to obtain the former.

A survey may be made by a deputy surveyor without possession of the warrant at the time, if he has once had it, and entered it in his book.

Where a leading warrant plainly describes land in one district, it is in no respect a fraud upon the act of 3d *April* 1792, that the same and many adjoining warrants were previously delivered to the surveyor of another district into which some of them might run, who handed them to the surveyor of the first district; and that the whole, after he had entered twelve or thirteen in his books, were by him returned to the surveyor from whom he got them, who entered them *all* in his own book.

(*a*) 2 *Smith's Laws* 207.
(*b*) *Ibid.*

(*c*) 2 *Binn.* 124.

The plaintiff asserted that a survey was unnecessary; but if otherwise, here was a line of a legal survey, the depreciation line, which brought the case within *M'Rhea's Lessee* v. *Plummer* (a). He objected to the defendant's title, that the survey was illegal because the warrant was not in *Leet's* hands then or afterwards, and because the warrants were all previously delivered to *Hoge*, who had no authority to hand them over to *Leet*. The entry in the books of both surveyors was a fraud upon settlers, and upon the act of the 3d, of *April* 1792.

The President of the Common Pleas (*Roberts*) charged the jury in favour of the defendants upon both points; and a bill of exceptions was sealed, which was now argued by

*A. W. Foster* for the plaintiff in error, and

*Allison* and *Baldwin* for the defendants in error.

TILGHMAN C. J. having been unwell, was not present at the argument, and gave no opinion.

YEATES J. The bill of exceptions in this case presents two questions to the Court for their decision.

1. Was the survey under which the defendants claimed the land, illegal and unauthorised under all the circumstances?

2. Was the plaintiff competent to support an ejectment?

1. It has been contended, that the survey made by *Leet* was unauthorised and void, because it did not appear that at the time the survey was made, the warrant was then in his possession. I admit that it does not so appear. But what then? Does the act of the 3d of *April* 1792 require it? By no means. The meaning of the law on this point cannot be mistaken. The fourth section directs, that the deputy shall reside within or as near as possible to his district, and when he receives a warrant, shall make fair and clear entries in a book to be provided for that purpose, distinguishing the day on which he received it, which book shall be open at all seasonable hours, to every applicant. The fifth section directs that the deputy surveyor shall proceed to survey the lands described in the

(a) 1 *Binn.* 227.

warrants according to their priority, but shall not survey any
tract of land, that may have been actually settled and improved
prior to the date of the entry of the warrant, under such war-
rant. He shall keep a survey book, which shall be liable to be
inspected by all persons on paying a certain fee for the search
or copies of surveys. The intention of the law then was to
give locality to the warrants thus entered, and to give notice
thereof to all appliers. If the intended actual settler wished
to appropriate to himself a particular spot, he could by in-
specting the book of entries, ascertain whether it had been
applied for by a special warrant previously entered, and in
case of an indescriptive warrant unaccompanied by a survey,
he might seat himself down and commence his improve-
ments. Here would be full notice and perfect security, and
the object of the legislature would be attained. It would be
of no advantage to any adverse claimant to see the copy of
the warrant, when he could inspect the entry book, which
contained an abstract of all its material parts. As to the de-
puty surveyor, he had received the warrant which was duly
entered, and it could be of no moment either to him or
others, whether he kept the copy in his hands, or delivered
it over to another person. In either case his authority was
precisely the same.

But it has been urged, that *Hoge's* entry of these thirteen
or fourteen warrants already entered by *Leet*, tended to de-
ception by holding out false colours to appliers. This cannot
be. How could the entry of a leading warrant accurately and
precisely descriptive of a particular spot, several miles dis-
tant from the known line of *Hoge's* district, and of a dozen
other warrants adjoining and adjoining, serve to mislead a
man of the plainest understanding? Such a person would at
once see, that the palpable design of the entry was to give in-
formation of the leading warrant, and in what manner the
succeeding ones would probably be connected and strung to-
gether. He would obtain every light he could desire by con-
sulting the survey book of *Hoge*, who necessarily would be
confined to surveys upon warrants within the limits of his
own district. Upon this point I think the Court of Common
Pleas judged correctly.

2. We know not by the bill of exceptions, when or where
the plaintiff made his settlement, or what improvement he

*1812.*

STOCKMAN
*v.*
BLAIR
et al.

or his predecessors had made; but this we know, that his settlement was undefined by any survey *official* or *private*, and we are not informed of any consentible lines established between him and the adjoining neighbours. In *Bond's Lessee* v. *Fitz-Randolph* at a Court of *Nisi Prius* in this place in *May* 1797, I expressed the sentiments of Judge *Smith* and myself, as to the necessity of an official survey, or a fair attempt to procure one by an actual settler, whereon to found his ejectment. The same determination was given by us in *May* 1799 in *Dawson's Lessee* v. *Laughlin* upon full consideration. The first decision, which it is admitted has regulated the practice since, and has been acquiesced in above fifteen years, though at *Nisi Prius*, is intitled to *some weight.* It is of great moment that the law should not be in a state of fluctuation. But were it *res integra*, I see no reason, after the elaborate argument which the subject has undergone this term, to retract the opinion I had before formed. I think the doctrine is founded on the true spirit of the act of the 3d of *April* 1792, is bottomed on sound policy, and tends to prevent litigation. The pretensions of a plaintiff suing for his supposed right in a court of justice should be known and certain. Considered as a part of a new system for granting vacant lands, there is the same reason for requiring an official survey on the improvement of a settler, as that upon a warrant. No ejectment would lie by the limitation act, unless a survey had been made thereon, and with the same implied exceptions. Such settler evinces " his conformity to the provisions of the act," by complying with this pre-requisite. A contrary doctrine tends to retard the settlement of the country. The person first occupying the land with an intention of settling, would keep others desirous of settling at bay, unless his boundaries were circumscribed by some public and notorious act. In whatever direction they might choose to fix their improvements, in the same direction might he advance his claim, under the pretext of his prior settlement being intitled to a *reasonable extent.* These are some of the evils which were experienced before the *American* revolution, from a crude notion entertained by a few persons respecting the doctrine of improvements. Law suits were thus promoted, and the permanence of landed titles was shaken. I do not assert however, that the unbending rule is, that in

all cases the official survey should be made previous to the institution of an ejectment by an actual settler. If he uses every reasonable endeavour to procure a survey, but fails in the attempt, he might circumscribe his boundaries as claimed by him, by some open act, which would be binding on him at a future day. He would thus do all that would lie in his power.

But we have been told that the plaintiff has *adopted* the line of a depreciation survey as one of his boundaries, and that the case falls within the principle laid down in *M'Rhea's Lessee* v. *Plummer*, 1 *Binn*. 227. In that case the lines had been before run and marked by legal authority, and the deputy surveyor after receiving the warrant, had gone upon the ground and proved the correctness of some of the lines which had been run. Here was an unequivocal act of adoption, and the running again and re-marking the lines, would have been an idle ceremony. But how is this depreciation line adopted here by the plaintiff? What portion of space will a single line contain? We cannot substitute the arguments of counsel as the facts of the case; and no facts are set out in the bill of exceptions, from which we can infer a privity between the plaintiff, and *Blair* and *Baker* two of the defendants, from which he can derive a benefit from any line agreed upon between the two latter.

In every point of view, in which I have been able to consider this case, I am of opinion that the judgment of the Court of Common Pleas should be affirmed.

BRACKENRIDGE J. Having been at the bar in this country, and having, with a view of being able to give advice to clients, considered the law of *April* 3d 1792, and formed a system of construction in my office, it will not be wondered at if I have been prepossessed by my own, opposed to the construction of others. It would be inconsistent with the opinions delivered to those consulting me, to say that in the capacity of judge I approve of contrary opinions, otherwise than in contemplation of law, where I may be bound to concede to the majority, and this for the sake of uniformity of decisions, that the maxim of the *non quieta movere* may be observed. I will only say in justice to myself, and for the sake of clients, that I could have anticipated no idea of the

1812.

STOCKMAN
v.
BLAIR
et al.

construction in many particulars put upon this law by the courts. In the particular before us, I could have had no idea that a settler could not recover in an ejectment without an official survey. I had thought it would be sufficient if he had in any way designated his boundary. This was the old law of the doctrine of improvements, and I had not conceived, nor can I now conceive, that the act of 1792 made any change in this particular. Nor did the case of *Fitz-Randolph* and *Bond*, so far as I can recollect, or now observe, hold out the idea of the necessity of an *official survey*, where lines agreed upon, or in the popular language *consentible lines*, had designated the boundary. The same in the case of having made a *private* survey by marked lines. As to *the attempt* to get an official survey, how that could help I cannot comprehend. The object of a designation of boundary was twofold, to give notice to the public of the extent of the occupancy north, south, east or west, to the end that others wishing to appropriate from the general mass might know what remained; and in the second place, to ascertain for what it was an ejectment was brought, and of what on recovery an officer might give possession. But that an ejectment could not be sustained for an actual *occupancy by settlement*, without an official survey or any other designation of boundary, but that of the fence or line of the improvement, I could not have conceived. Much less could I have had any idea that a survey could be made, otherwise than by going on the ground and marking the lines. As to the taking the lines of an old survey, and draughting them in the surveyor's chamber, it did not enter into my mind. In this and other particulars of construction, I have dissented in my own mind, when they have been made by the courts. *Montesquieu* speaking of the *British* constitution, which he traces from its *Saxon* origin, applies the terms, " *ce beau systeme a eté trouvé dans les bois;*" " this beautiful system has been found in the woods." But it is impossible for me to apply this eulogy to that system which has been found in the woods of our new settlement, because it does not appear to me to have been the best. But as has been said, it would be perhaps a *greater evil* to reverse it, than to let it now stand. I shall therefore leave it to those who have contributed to form the system, to say whether in this case, the judgment of the court below is within the rule

1812.

STOCKMAN
v.
BLAIR
et al.

of it. As to an entry with sundry surveyors of different districts, I would take it to be a *fraud*, because it was calculated to mislead the settlers, if it could be supposed that any notice was given by the entry, of what was meant to be taken by a survey under it. And hearing of no decision on this head, I may be at liberty to reverse the judgment on this ground, and which I think it will be advisable to do.

It not appearing also that the question of the being able to support an ejectment for a possession by actual occupancy, and so far as the improvement extends, has received other than a *Nisi Prius* or Circuit Court decision, and not that I know of, having been at any time considered in term, I may also on this ground be at liberty to reverse the judgment of the court below. For it is impossible for me to comprehend, that under the act of *April* 1792, one half the object of which, it is acknowledged on all hands, was the settlement of the country, a person who had entered and settled, when put out of his messuage or possession, could not proceed by ejectment to recover that certain extent, without an official survey or any survey at all, or other designation of boundary than what his possession gave. As to the extent from his possession, whether according to the distance or the square of the distance, north or south, which is the ratio of gravitation, it might be difficult to say without a designation; and therefore I would have no objection to the confining his evidence and his recovery to this portion. But for this portion, I can see no principle of law, or fair construction of the act of assembly, which can hinder his recovery. There was not a surveyor for every settler, to accompany him when he went to look out for the place where, and to survey when he fixed upon it. What is more, it would seem from the act, that he must have a settlement before the officer would be justifiable in surveying for him. And being put off this by an intruder, who would say he had the better right to have an official survey? Was the officer under the necessity of determining between them, or to leave it to an ejectment to try the right? The fact is, that official surveys could not be got in the first instance or for a long time; and must the law be suspended as to all right of regaining possession until this was obtained? It would seem to me that this at least well deserves a reconsideration.

Judgment affirmed.